# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRIAN A. RANDOLPH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-242-JHP-PJC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Claimant, Brian A. Randolph ("Randolph"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. Randolph appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled. This case has been referred to the undersigned. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

### Claimant's Background

At the hearing before the ALJ on December 21, 2011, Randolph was 43 years old. (R. 40). Randolph had a high school degree and two years of college education. *Id.* He last worked as a machinist technician and was fired for anger problems. (R. 41-42). Randolph stated he was unable to work due to panic attacks, anxiety, anger, and back pain. (R. 43, 47, 54, 67).

Randolph testified that he had been experiencing panic attacks for two to three years. (R. 43). Randolph said that during a panic attack, he shook, had racing thoughts, had difficulty concentrating, and would scratch himself. (R. 43-44). He would scratch and pick at himself until cuts and sores would appear on his body. (R. 43, 54). He also had a lack of appetite due to anxiety, and he had lost weight from 195 pounds to 161 pounds. (R. 57). Randolph testified that he had attempted suicide three times and thought of suicide three to four times a week. (R. 44, 54). At the time of the hearing, he had not been seeing a counselor, but he did have an appointment scheduled with one. (R. 44).

Randolph testified that, approximately five years earlier, he had been treated on an inpatient basis for one month after a suicide attempt. (R. 44-45). He said that he jumped from a three-story building, and his left arm was impaled by a piece of metal. (R. 45). Randolph testified that, as a result of that injury, his left arm was still going numb at the time of the hearing. *Id.* Randolph testified that in 1993 he had a car accident, hitting a telephone pole because he was depressed and not "driving correctly." (R. 55).

Randolph testified that he had trouble going to sleep due to racing thoughts, and he was taking amitriptyline for that. (R. 45, 57). He said that he had difficulty staying asleep because of his back. (R. 57). He said that he had side effects of his head being "foggy" and his heart racing. (R. 45-46). Due to his poor sleep, he felt fatigued and "drained" all the time. (R. 57).

Randolph testified that he did not have a driver's license. (R. 46). His license had been suspended ten years earlier for traffic tickets, and he had received a ticket for driving without a license five years earlier. *Id.* Five years earlier was the last time Randolph had driven. (R. 47). He said that his parents provided transportation for him. *Id.*

Randolph said that walking hurt his back and he would have to stop after 50 feet because his legs would go numb. *Id.* Randolph said that he could stand for about a half-hour in one place, and he could stand for one to two hours if he could move around. (R. 49). He could sit for about an hour. *Id.* Randolph testified that he could lift about 15 pounds at the time of the hearing, but ten years earlier he could have lifted 50 pounds. (R. 48). He said that his physicians wanted to refer him to a neurosurgeon, but he did not have any insurance. (R. 47-48). He was trying to go to the OU Medical Center because he would pay on a sliding scale there. *Id.*

Randolph testified that 20 years earlier he had been charged with DWI after drinking and driving. (R. 50-51). He had smoked marijuana about 25 years earlier.[1] (R. 51). He smoked cigarettes down to one-half pack a day from two-and-a-half packs two months before the hearing. *Id.*

Randolph testified that every time he left his trailer, he would start shaking and his chest would pound, and he would feel uncomfortable. (R. 52). He had previously gone to a casino for "about two months," but he had to stop because he would hyperventilate. (R. 58-59). He had previously stated in documents that he went to the store two to three times a week, but he had stopped going about six months before the hearing. (R. 59). He stopped going out because he would feel worse and start picking at his skin. (R. 60).

Randolph testified that he had difficulty remembering doctors' appointments and when to take his medications. (R. 55). He would go two or three days in a row without bathing or changing his clothes. (R. 56-57). He did chores of taking out the trash and riding the lawn mower, but his parents had to remind him, because he could not remember if he had done the

---

[1] The ALJ asked several follow up questions regarding the timing of when Randolph used marijuana and heroin. (R. 65-67).

chores. (R. 58). He would need to be reminded five or six times. *Id.* His parents took away his checkbook because he would write checks without realizing that he did not have money in his account. (R. 60). He would forget to write down checks and ATM withdrawals in his checkbook. *Id.*

Randolph testified to having racing thoughts that interfered with his ability to concentrate. (R. 61). He quit playing video games because he couldn't maintain his concentration. *Id.* It would take him a week to cut the grass because he would start and then stop and do something else. *Id.* He had this same problem of inability to maintain attention and concentration at work, and the problem had caused conflicts and arguments. (R. 61-62).

Randolph said that he had an anger problem since he was 15, and he had been fired in Texas from a job as a forklift driver when he had pushed his supervisor while having an argument. (R. 52). He thought he had been fired from five jobs due to problems with supervisors or bosses. (R. 62). He would argue with his mother because she told him what to do. (R. 60). He would get angry with his pets if they had an accident on the floor. *Id.*

Randolph said that he was unable to handle routine stress at a job because coworkers might ask stupid questions or he might be given a deadline that he could not meet. (R. 62-63).

Randolph was seen at OCHC Community Clinic in Miami, Oklahoma on March 4, 2010 for chronic headaches that had been ongoing for three years. (R. 380). He was prescribed medication. *Id.* He was seen again on April 1, 2010. (R. 379). On June 17, 2010, impressions were anxiety, headaches, and chronic back strain. (R. 378). On August 19, 2010, his medications were adjusted. (R. 377).

Randolph saw Shirley Chesnut, D.O., with NEO Medical Center in Miami, Oklahoma, on September 1, 2010. (R. 367). Randolph said that he had chronic back pain "all the time" that

sometimes radiated down both legs. *Id.* The pain was exacerbated by walking. *Id.* Randolph said that he had tried steroid injections, muscle relaxers, pain pills, and physical therapy, and nothing helped. *Id.* He said that he could not sleep due to pain. *Id.* Dr. Chesnut wrote that Randolph did not appear to be in pain. *Id.* She appears to have prescribed amitriptyline and Lortab. *Id.* Dr. Chesnut wrote a letter dated September 10, 2010 stating that Randolph needed insurance "so that he may receive diagnosis and treatment for a possible neurological condition." (R. 351).

It appears that Dr. Chesnut's office may have given Randolph refills for Lortab, Prozac, clonidine, Flexeril, and amitriptyline on January 19, 2011. (R. 366). Randolph was seen by a nurse practitioner at Dr. Chesnut's office on February 21, 2011, and he complained of pain in his legs and back. (R. 365). On examination, he was noted as being restless and having muscle spasms. *Id.* His medications were refilled. *Id.* On March 21, 2011, the nurse practitioner diagnosed Randolph with chronic back pain, and she noted that Randolph was stiff when walking or sitting. (R. 364). She noted clonus[2] in his legs. *Id.* She also noted his social anxiety. *Id.*

On April 18, 2011, the nurse practitioner with Dr. Chesnut's office noted that Randolph's speech was robotic and "mildly anxious." (R. 360). Randolph had numerous lesions on his arms. *Id.* She adjusted his medications. *Id.* On August 1, 2011, Randolph reported having fallen twice in the previous two weeks. (R. 359). The nurse practitioner again noted clonus of Randolph's legs. *Id.* She referred him to the neurology department of the OU Medical Center. *Id.* On September 1, 2011, and November 1, 2011, the nurse practitioner again noted clonus. (R. 357-58).

---

[2] "Clonus" is "alternate muscular contraction and relaxation in rapid succession." *Dorland's Illustrated Medical Dictionary* 379 (31st ed. 2007).

Randolph was seen at Community Health Center of Southeast Kansas on November 30, 2011 as a new patient. (R. 369-71). He reported depression and anxiety. (R. 369). It was noted that his visible skin was covered in scabbed areas. (R. 370). On examination, Randolph had some tenderness of his lower back. *Id.* The physician restarted him on some of his medications. *Id.*

Agency consultant Derrise L. Garner, Psy. D. completed a psychological evaluation of Randolph on May 25, 2010. (R. 318-22). Dr. Garner gave several opinions on Randolph's functional capacity, including that he could understand and remember moderately complex instructions and could concentrate and persist on simple tasks during a normal work day. (R. 321). She said Randolph could interact in a limited contact situation with the general public and with work supervisors or coworkers. (R. 322). She said that Randolph could adapt to a "simple work environment." *Id.* On Axis I,[3] Dr. Garner diagnosed generalized anxiety disorder; major depressive disorder, recurrent, severe, with psychotic features; polysubstance dependence, in full remission by Randolph's report; and learning disorder, not otherwise specified, also by Randolph's report. *Id.* Dr. Garner scored Randolph's Global Assessment of Functioning ("GAF")[4] as 42. *Id.*

On July 23, 2010, nonexamining agency consultant Carolyn Goodrich, Ph.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment. (R.

---

[3] The multiaxial system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[4] The GAF score represents Axis V of the multiaxial assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. *See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

332-49). On the Psychiatric Review Technique form, for Listing 12.04, Dr. Goodrich noted depressive syndrome. (R. 335). For Listing 12.06, Dr. Goodrich noted anxiety. (R. 337). For Listing 12.09, Dr. Goodrich noted behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (R. 340). For the "Paragraph B Criteria,"[5] Dr. Goodrich said that Randolph had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 342). In the "Consultant's Notes" portion of the form, Dr. Goodrich noted that Randolph had received antidepressants from a primary care physician. (R. 344). Dr. Goodrich also summarized the report of Dr. Garner in some detail and noted Randolph's reported activities of daily living. *Id.* Dr. Goodrich concluded that Randolph was capable of semi-skilled work. *Id.*

In Dr. Goodrich's Mental Residual Functional Capacity Assessment, she indicated that Randolph was markedly limited in his ability to understand, remember, and carry out detailed instructions and in his ability to interact appropriately with the public. (R. 346-47). In her narrative assessment, Dr. Goodrich said that Randolph could "perform simple complex tasks," could relate to others on a superficial work basis, but not the general public, and could adapt to a work situation. (R. 348).

---

[5] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

Agency consultant Theron Bliss, D.O., completed a physical examination of Randolph on June 5, 2010. (R. 324-29). On examination, Randolph had normal function of his musculoskeletal system, except that he had positive straight leg raise "lying on the right." (R. 325). Dr. Bliss's first impression was back pain with a primarily thoracic and cervical distribution. *Id.* He found no evidence of neurological impairment, strength impairment, or range of motion impairment. *Id.* Dr. Bliss's other impressions were chronic headache that could be secondary to long-term back pain or hypertension; hypertension that was mildly controlled; and depression. *Id.* An agency nonexamining consultant found that Randolph's physical impairments were nonsevere. (R. 331).

## Procedural History

Randolph filed his applications for disability insurance benefits and supplemental security income benefits on March 10, 2010. (R. 152-57). The applications were denied initially and on reconsideration. (R. 91-99, 101-06). An administrative hearing was held before ALJ Edmund C. Werre on December 21, 2011. (R. 32-84). At the hearing, Randolph amended his asserted onset date to February 24, 2010. (R. 38). By decision dated February 22, 2012, the ALJ found that Randolph was not disabled. (R. 19-30). On February 22, 2013, the Appeals Council denied review. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole,

---

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

### Decision of the Administrative Law Judge

In his decision, the ALJ found that Randolph met insured status requirements through December 31, 2014. (R. 21). At Step One, the ALJ found that Randolph had not engaged in any substantial gainful activity since his amended alleged onset date of February 24, 2010. *Id.* At Step Two, the ALJ found that Randolph had severe impairments of generalized anxiety disorder; major depressive disorder with psychotic features; learning disorder, not otherwise specified by history; anger management disorder; and polysubstance dependence in reported remission. *Id.* The ALJ found that Randolph's alleged impairments of degenerative disc disease and hypertension were nonsevere. (R. 21-22). At Step Three, the ALJ found that Randolph's impairments, or combination of impairments, did not meet any Listing. (R. 22).

The ALJ found that Randolph had the RFC to perform a range of work at all exertional levels with the following nonexertional limitations:

> He is able to understand, remember, and [carry out] simple and some moderately complex instructions and [is] able to relate and interact with co-workers and supervisors on a work-related basis only with no or minimal interaction with the general public.

(R. 23). At Step Four, the ALJ determined that Randolph could return to past relevant work. (R. 28). As an alternative finding, at Step Five, the ALJ found that there were a significant number of jobs in the national economy that Randolph could perform, taking into account his age, education, work experience, and RFC. (R. 29-30). Therefore, the ALJ found that Randolph was not disabled at any time from February 24, 2010 through the date of his decision. (R. 30).

**Review**

Randolph's sole point on appeal is that the ALJ's RFC determination was not supported by substantial evidence, but he makes several separate arguments under this one point. First, Randolph contends that the ALJ's analysis of the opinion evidence of Dr. Garner was flawed. Plaintiff's Opening Brief, Dkt. #17, pp. 6-7. Second, Randolph states that the ALJ erred by finding his physical impairments of degenerative disc disease and hypertension to be nonsevere. *Id.* at 8-9. Finally, Randolph contends that the ALJ failed to develop the record as required. *Id.* at 9-10. Regarding the issues raised by Randolph, the undersigned recommends that this case be affirmed because the ALJ's decision was supported by substantial evidence and complied with legal requirements.

**Dr. Garner's Opinion Evidence**

Randolph argues that the ALJ failed to properly weigh the opinion evidence, and he focuses especially on the report of Dr. Garner, an examining physician. Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). An ALJ is required to discuss all opinion evidence and to explain what weight he gives it. *Id.* "Regardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. 404.1527(c). The ALJ is required to consider the opinion of an examining physician and to provide specific, legitimate reasons for rejecting it. *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003) (ALJ erred in rejecting opinion evidence of examining physician without explanation). *See also Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007) (ALJ erred by adopting some of the examining consultant's opinions while ignoring others).

Randolph states that Dr. Garner included in her report a limitation of his ability to interact with coworkers and supervisors and that the ALJ did not include this limitation in his RFC determination. Plaintiff's Opening Brief, Dkt. #17, p. 6. Randolph also states that the ALJ did not include Dr. Garner's limitation that he could only concentrate and persist on simple tasks or her limitation to a "simple work environment." *Id.* at 6-7. Finally, Randolph complains that the ALJ did not include a reference to Dr. Garner's opinion that he could not manage his funds independently. *Id.* at 7.

Regarding the first point, Dr. Garner's opinion was that Randolph could "interact in a limited contact situation" with coworkers and supervisors. (R. 322). When Dr. Goodrich then reviewed Dr. Garner's report and the other evidence available to her, she changed this language to state that Randolph could relate to others on a superficial work basis. (R. 348). The ALJ changed this language even further by stating that Randolph could "relate and interact with co-workers and supervisors on a work-related basis only." (R. 23). The undersigned finds that the ALJ should have included the word "superficial" in his description of the limitation of Randolph regarding contact with coworkers and supervisors, because that would have more closely reflected the substantial evidence (Dr. Goodrich's report) upon which his RFC determination was based.

The omission of the word "superficial" here appears to be at most harmless error:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not adequately evaluate and discuss the medical-source evidence. Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.

*Keyes-Zachary*, 695 F.3d at 1167. The *Keyes-Zachary* court also said that "common sense, not technical perfection, is [the] guide" of a reviewing court and that "[t]he more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection." *Id.* at 1166.

*See also Gay v. Sullivan*, 986 F.2d 1336, 1341 n.3 (10th Cir. 1993) (if ALJ erred, it was "minor enough not to undermine confidence in the determination of this case."); *Talamantes v. Astrue*, 370 Fed. Appx. 955, 959 (10th Cir. 2010) (unpublished) (rejecting claimant's argument that difference in wording between RFC determination and hypothetical to VE was a "significant distinction").

Here, the ALJ discussed the exact language of Dr. Garner of a "limited contact" situation that Randolph cites. (R. 22). Thus, the ALJ did not ignore the finding of Dr. Garner, but instead discussed it and ultimately altered in his RFC determination the wording of the limitation found by Dr. Garner. As stated above, the ALJ should have been more precise in the wording used in his RFC determination and in his hypothetical to the vocational expert. This case, however, is not one in which the ALJ rejected a limitation by a physician, but instead here the ALJ's RFC adequately addressed the opinion of the examining physician. *See, e.g., Sullivan v. Colvin*, 519 Fed. Appx. 985, 988-89 (10th Cir. 2013) (unpublished).

Randolph's other arguments relating to Dr. Garner's opinions are similarly unavailing. Dr. Garner herself said that Randolph could understand and remember moderately complex instructions, which is the language used by the ALJ in his RFC determination. (R. 23, 321). Thus, this language was not a rejection or a failure to adopt an opinion of Dr. Garner. Moreover, the ALJ specifically discussed Dr. Garner's opinion that Randolph could concentrate and persist on simple tasks during a normal work day. (R. 23). The undersigned agrees with the Commissioner that the VE's testimony at Step Five identifying unskilled jobs that Randolph was capable of performing adequately addressed the limitation to "simple tasks" even if it was error for the ALJ not to include that limitation more specifically in his RFC. *See, e.g., Chrismon v. Colvin*, 531 Fed. Appx. 893, 899-90 (10th Cir. 2013) (unpublished) (unskilled jobs with specific

vocational preparation rating of two was consistent with limitation to "simple, repetitive tasks"). These jobs also adequately address the opinion of Dr. Garner that Randolph could adapt to a simple work environment. Further, the undersigned finds no significance to Dr. Garner's statement that Randolph could not manage his own funds, because there are no additional functional limitations that are suggested by this statement. None of the jobs identified by the VE include any need for an ability to manage funds.

Finally, Randolph's allusion to Dr. Garner's scoring of his GAF as 42 is also not persuasive. First, again, the ALJ specifically mentioned the GAF score given by Dr. Garner, so this is not a case where an ALJ ignored a low GAF score. (R. 26). Second, while a GAF score can be helpful[7] in understanding a physician's views of the overall status of a patient, that physician's written comments are even more helpful. *See Harper v. Colvin*, 528 Fed. Appx. 887, 891-92 (10th Cir. 2013) (unpublished) (no error when ALJ did not mention GAF score but did discuss physician's report). Here, the functional capacity opinions of Dr. Garner were more important than the GAF score, the ALJ discussed both the opinions and the GAF score, and his analysis of Dr. Garner's evidence was adequate.

**Physical Impairments**

Randolph next argues that the ALJ's RFC determination was not supported by substantial evidence in that he failed to find any physical limitations. Plaintiff's Opening Brief, Dkt. #17, pp. 8-9. Randolph complains that the ALJ found his degenerative disc disease and hypertension to be

---

[7] In *Krchmar v. Colvin*, 548 Fed. Appx. 531, 534 n.2 (10th Cir. 2013) (unpublished), the Tenth Circuit noted that use of the GAF score has been discontinued in the new fifth edition of the Diagnostic and Statistical Manual of Mental Disorders published in 2013.

nonsevere. He states that a handicapped parking application signed by a physician that indicated that Randolph could not walk 200 feet was treating physician opinion evidence.

A basic aspect of Social Security disability law is that the showing of the "mere presence" of a condition is not sufficient to meet the severity requirement of Step Two of the five-step sequential process. *Cowan v. Astrue*, 552 F.3d 1182, 1186 (10th Cir. 2008). Further, at every step through Step Four, the claimant bears the burden of establishing disability. *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1. (10th Cir. 2013). Thus, here, Randolph had the burden of establishing that his degenerative disc disease and hypertension not only existed, but that they also "significantly limit[ed] his ability to do basic work activities."[8] 20 C.F.R. § 404.1520(c).

The treating records in Randolph's case are sparse, and there is no significant medical evidence that Randolph had functional effects from his physical conditions. (R. 304-15, 351-52, 356-80). On the other hand, the ALJ's decision not to include any physical limitations was supported by substantial evidence in the form of the physical examination and report of Dr. Bliss and the nonexamining opinion evidence of Dr. Marks-Snelling. (R. 324-29, 350). *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination).

The undersigned rejects the argument that the handicapped parking application was treating physician opinion evidence that required discussion and analysis. *See, e.g., Halsell v.*

---

[8] Even nonsevere impairments should be considered by an ALJ in formulating his RFC determination. *See Wells*, 727 F.3d at 1064-65 (collecting Tenth Circuit unpublished cases with "divergent results" on issue of nonsevere impairments). In Randolph's case, it is clear that the ALJ found that Randolph had failed to establish that his degenerative disc disease or his hypertension significantly affected his ability to work, and the ALJ therefore omitted any physical limitations from the RFC determination.

15

*Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (unpublished) (disability parking placard was not relevant because of differing standards of disability); *Wilson v. Colvin*, 2014 WL 357052 (N.D. Okla.) (handicapped parking application with a check mark and no supporting examination notes or findings was not opinion evidence that ALJ was required to discuss); *Bryant v. Astrue*, 2010 WL 4628721 (D. Kan.) (treating physician's comment on application for a permanent disabled parking placard was not "so probative as to require discussion"); *Livingston v. Astrue*, 2010 WL 5851124 (S.D. Fla.) (failure to mention parking permit application was not reversible error in part because such applications are "generally of little relevance to a formal disability analysis"). *But see Grabczyk v. Astrue*, 2010 WL 3894113 (D. Colo.) (parking permit application was treating physician opinion evidence, and ALJ did not give sufficient reasons for rejection); *Bailey v. Astrue*, 2010 WL 3834406 (E.D. Okla.) (same).

Here, the parking placard application is dated August 19, 2010, and that date corresponds with the date of a treating record at the OCHC Community Clinic in Miami, Oklahoma. (R. 274, 377). The August 19, 2010 treating record consists of one page that notes low back pain in the notes of physical examination and as the diagnostic impression. (R. 377). The sparse notes included on the record, and the fact that the physician who saw Randolph in August appears to have seen Randolph only once before in March 2010, weaken the argument that the application was a treating physician opinion. (R. 377-80). The undersigned finds no error in the ALJ's omission of discussion of this application.

**Duty to Develop**

The undersigned finds Randolph's last argument to be unintelligible and unavailing. Randolph at one point appears to argue that no consultative examination was conducted here, but then he refers to Dr. Bliss, who examined Randolph and prepared a report dated June 5, 2010.

16

Plaintiff's Opening Brief, Dkt. #17, pp. 9-10. Randolph then argues that Dr. Marks-Snellings' opinion is entitled to "no weight whatsoever," apparently because the opinion was given on November 9, 2010 before much of Randolph's treatment occurred or before records were submitted to the administrative file. *Id.* at 9. The only authority Randolph cites for this theory is a 1995 Eighth Circuit case, and the undersigned does not consider that to be persuasive. None of the sparse treating records that were added to the administrative file after the date of Dr. Marks-Snellings' report are of such significance as to make her opinion stale or of questionable validity. (R. 351-52, 356-80). *Compare Chapo v. Astrue*, 682 F.3d 1285, 1293 (10th Cir. 2012) (ALJ's reliance on a "patently stale" opinion of agency examining consultant was "troubling").

Similarly, the undersigned rejects Randolph's suggestion that a new consultative examination is required in order to consider the additional treating evidence. An ALJ "has a basic duty of inquiry to fully and fairly develop the record as to material issues." *Baca v. Department of Health and Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993). The Tenth Circuit considered the ALJ's duty to develop in the context of the ALJ's discretion to order consultative examinations in *Hawkins v. Chater*, 113 F.3d 1162, 1166-70 (10th Cir. 1997). The court in *Hawkins* first noted that the ALJ has broad latitude in ordering consultative examinations. *Id.* at 1166. It summarized three instances in which a consultative examination might be required: (1) when there is a direct conflict in the medical evidence; (2) when the medical evidence is inconclusive; and (3) when additional tests are required to explain a diagnosis already contained in the record. *Id.* None of these three situations are applicable to Randolph's case, and the ALJ did not abuse his discretion. Moreover, counsel for Randolph did not ask the ALJ for an additional consultative examination at the hearing. (R. 34-37, 80-84). When a claimant is represented by counsel, the ALJ can

17

ordinarily rely on counsel to structure and present the claimant's case. *Hawkins*, 113 F.3d at 1166-67.

## Conclusion

The ALJ's decision is supported by substantial evidence and complies with legal requirements. Based on the foregoing, the undersigned recommends that the decision of the Commissioner denying disability benefits to Claimant be **AFFIRMED.**

## Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation, but must do so by July 16, 2014. If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b). A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm waiver rule"). *Moore v. Astrue*, 491 Fed. Appx. 921, 923 (10th Cir. 2012) (unpublished), *citing In re Key Energy Res., Inc.*, 230 F.3d 1197, 1200-01 (10th Cir. 2000).

Dated this 2nd day of July 2014.

_____
Paul J. Cleary
United States Magistrate Judge